IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Baxter Felix Vinson, ) | C/A No. 0:10-847-CMC-PJG |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Sharonda Sutton; Alan Walls, MD; Larry ) | |
| Cartledge; Karen McCullough; Marie ) | |
| Sherman; Robert Poiletman, MD, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Plaintiff Baxter Felix Vinson ("Vinson"), a state prisoner housed with the South Carolina Department of Corrections ("SCDC"), filed this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on a motion for summary judgment filed by Defendants Walls, McCullough, Sherman, and Poiletman (collectively the "Medical Defendants") (ECF No. 122) and a motion for summary judgment filed by Defendants Sutton and Cartledge[1] ("SCDC Defendants") (ECF No. 123). Vinson filed a response in opposition (ECF No. 130) and the defendants replied (ECF Nos. 132 & 133). Having carefully considered the parties' submissions and the applicable law, the court concludes that the SCDC Defendants' motion should be granted, that the Medical Defendants' motion should be granted in part and denied in part, and that this matter should proceed to trial against Defendants Walls, McCullough, and Sherman.

---

[1] The plaintiff has stipulated to dismissal of all claims against Defendant Cartledge. (ECF No. 130 at 1.)

Page 1 of 16



## BACKGROUND

This matter arises out of a series of incidents that began on February 28, 2008, when Vinson, who has been diagnosed with bipolar disorder with a history of self-cutting, inserted a foreign body into his lower abdomen. On March 7, 2008, Vinson, seeking additional treatment, cut both his arms and later his abdomen with a razor blade, resulting in a bowel evisceration. Vinson was placed in a restraint chair and ultimately transferred to an emergency room, where he underwent surgery for his injuries.

Vinson filed this action alleging that the defendants were deliberately indifferent to his medical needs. Vinson further claims that the defendants used excessive force by placing him in a restraint chair.

## DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

PJG

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.  The moving party has the burden of proving that summary judgment is appropriate.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

**B.     Deliberate Indifference—Medical Treatment**

The Eighth Amendment to the United States Constitution expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.  To establish a claim under the Eighth Amendment for deliberate indifference to medical needs, an inmate must establish two requirements: (1) a sufficiently serious deprivation occurred, resulting "in the denial of the minimal civilized measure of life's necessities," and (2) the prison official had a sufficiently culpable state of mind. Farmer v. Brennan, 511 U.S. 825, 834 (1994).  To satisfy the second prong, an inmate must show that the prison official's state of mind was "deliberate indifference" to the inmate's health and safety. Id.  A prison official is deliberately indifferent if he has actual knowledge of a substantial risk of harm to an inmate and disregards that substantial risk.  Id. at 847; Parrish v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004).  To be liable under this standard, the prison official "must both be aware



of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Furthermore, not "every claim by a prisoner [alleging] that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To establish deliberate indifference, the treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Mere negligence, malpractice, or incorrect diagnosis is not actionable under 42 U.S.C. § 1983. See Estelle, 429 U.S. at 106. While the Constitution requires a prison to provide inmates with medical care, it does not demand that a prisoner receive the treatment of his choice. Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citation omitted) (alterations in original); see also Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

A prisoner's disagreement as to the appropriate treatment fails to rise to the level of a constitutional claim and fails to create a genuine issue of material fact. See Nelson, 603 F.3d at 449; see also O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ("Lay people are not qualified to determine . . . medical fitness, whether physical or mental; that is what independent medical experts are for."); Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment."); Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006)

("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of fact because he has not shown that he has any medical training or expertise upon which to base such an opinion.").

**C.     Excessive Force**

The " 'core judicial inquiry' " in an excessive force claim under the Eighth Amendment is " 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' "  Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).  "[N]ot . . . every malevolent touch by a prison guard gives rise to a federal cause of action."  Hudson, 503 U.S. at 9.  However, " '[w]hen prison officials maliciously and sadistically use force to cause harm,' . . . 'contemporary standards of decency always are violated . . . whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.' "  Wilkins, 130 S. Ct. at 1178 (quoting Hudson, 503 U.S. at 9).

When analyzing excessive force claims, courts should consider factors such as (1) the necessity for the application of force; (2) the relationship between the need for force and the amount of force used; (3) the extent of the injury actually inflicted; (4) the extent of the threat to the safety of the staff and prisoners, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) the efforts taken by the officials, if any, to temper the severity of the force applied.  Whitley v. Albers, 475 U.S. 312, 321 (1986).  Courts must give "wide-ranging deference" to the execution of policies and practices that in the judgment of the prison officials are necessary "to preserve internal order and discipline and to maintain institutional security."  Id. at 321-22.  The Supreme Court has recognized that prison officials work in an environment where there



is an ever present potential for violence and unrest, and that courts should not substitute their judgment for that of the officials who must make a choice at the moment when the application of force is needed. Id. The deference owed to prison administrators extends to "prophylactic or preventive measures intended to reduce the incidence of . . . breaches of prison discipline." Id. at 322.

**D.     Defendants Walls, Sherman, and McCullough**

Viewing the facts in light most favorable to Vinson, Vinson has presented evidence from which a reasonable jury could find that these defendants violated his Eighth Amendment rights.[2]

Vinson's medical encounters reflect the following facts. (See generally Med. Records, Encounters 1284 through 1300, ECF Nos. 122-2 at 4-9 & 130-1 at 1-5.) On February 28, 2008, after pushing a piece of metal into his stomach, Vinson was seen by a mental health counselor and was placed on crisis intervention, which included fifteen-minute observations, a paper gown, a suicide blanket and mattress, and that his room would be "shaken down" frequently. Later that evening Vinson cut the back of his left hand and indicated that would "do whatever he has to do to go to the hospital" for treatment of his abdomen. No active bleeding was noted at that time. Later, Defendant Sherman noted a moderate amount of blood on the floor of Vinson's cell and offered to treat Vinson's hand, which Vinson refused, instead requesting transfer to a hospital for his abdomen. A few minutes later, Vinson permitted an examination of his hand; however, while Defendant Sherman was attempting to apply steri-strips and a dressing, Vinson grabbed her hand, removed the strips and

---

[2] As an initial matter, the court finds unpersuasive Vinson's argument that the defendants' motions should be denied based on an alleged failure to comply with Rule 56 of the Federal Rules of Civil Procedure. Moreover, to the extent that the defendants are sued in their official capacities, they have argued, and Vinson has failed to refute, that the defendants are immune from suit pursuant to the Eleventh Amendment.



dressing, and refused treatment, indicating that he required stitches. During a recheck, the bleeding from Vinson's wound had stopped and Nurse Cahigan advised the officer to provide Vinson with more fluids. The next morning, during a follow-up with Nurse Floyd, no active bleeding was noted from Vinson's hand and no open wound was noted on the abdomen. Vinson demanded stitches for his hand and an x-ray of his abdomen, threatening to "open it up" to be sent to the hospital. Approximately thirty minutes later, the records note Vinson was "pallid, shivering-active dark red blood squirting from l[eft] hand laceration." A small red point was noted on his abdomen. Vinson hand was cleaned, the bleeding was controlled, and steri-strips were applied. Vinson was then sent to Kirkland Correctional Institution for x-rays. Dr. Neville examined the x-rays and indicated that it appeared that the foreign body had penetrated Vinson's intrabdominal cavity. Vinson was transported to a hospital for further evaluation. Upon return from the hospital, Vinson refused to be evaluated by Defendant McCullough or Defendant Sherman. The medical summary noted that the hospital paperwork stated "foreign body under the skin - not removed." Vinson's dressings were changed later that day.

On March 4, 2008, Vinson was seen by Human Services Coordinator Lawrence Cantey, Jr. to discuss his recent behavior and Vinson remained on crisis intervention. A late entry noted that on March 6, 2008, the surgery clinic recommended no intervention at that time and to continue his regular diet.

From the evening of March 7, 2008 through March 8, 2008, the following sequence of events are documented in Vinson's medical records. Nurse Sherman noted that at 9:50 p.m. Sergeant Johnson notified her that he was unsure of the location, but that Vinson had cut himself. Defendant Sherman told Johnson to instruct Vinson to apply pressure to control the bleeding that she and



Defendant McCullough were on their way with evening medications and would check on Vinson. At 10:17 p.m., Vinson was seen in medical for cutting his left and right forearms. Vinson informed Defendant McCullough that he had put a paper clip in his stomach after cutting his arms and that his behavior would continue until something was done about the foreign body in his stomach. Vinson stated that he was supposed to have surgery and refused to have the lacerations closed with steri-strips or durabond. Defendant McCullough indicated that no opening was noted on Vinson's stomach. Vinson was placed in a holding cell for monitoring, and he threatened to "make it bleed all over [the] holding cell." At 10:30 p.m., Defendant McCullough was called because Vinson had cut his abdomen and was holding a razor blade in place in his abdominal wall. No active bleeding was noted and Vinson stated to another nurse, "Do you think you can steri-strip this?" Defendant McCullough noted that she paged Dr. Walls at 10:45 p.m. At 11:05 p.m. Vinson was shouting abusive remarks at the officers. Although Vinson requested gauze on his intestines, Defendant McCullough noted no intestines were visible during nurse monitoring and Dr. Walls was paged again. At 11:25 p.m., Dr. Walls was paged for a third time. Dr. Walls responded and it was noted that Vinson may be placed in the restraint chair for behavior problems for a maximum of eight hours. At 11:45 p.m., Vinson was noted to continue to talk and shout at the officers without difficulty. At 12:45 p.m., Vinson was placed in the restraint chair and nursing was called to examine him. At this time, Defendant McCullough noted that Vinson had pulled out his intestine, that the intestine was bulging out of his abdomen, and that he was talkative and alert, asking if he was going to live. No active bleeding was noted and the nurse applied moistened gauze to Vinson's abdomen and treated his forearms. Dr. Walls was paged at 1:05 a.m., and he returned the page at 1:30 a.m. The note states that Dr. Walls instructed Vinson to be taken to the emergency room via prison van. Security

was notified and forms were completed for the transfer. The records demonstrate that Vinson was admitted to an emergency room at 4:15 a.m. (See Pl.'s Resp. Opp'n Summ. J., Ex. 25, ECF No. 130-25 at 2.)

Although Defendants Sherman and McCullough state that they were unaware that Vinson had eviscerated through his abdominal injury until after he was placed in the restraint chair for treatment, Vinson has presented evidence from which a reasonable jury could find otherwise. Specifically, in addition to his own testimony, Vinson has presented testimony from at least one witness that flatly contradicts the nurses' statements that they were unaware of the protrusion until a later time. (See James Aff. ¶¶ 7-9, ECF No. 130-4 at 1-2; see also Robinson Dep. 35, ECF No. 130-6 at 1.) Testimony further reveals that the exposure of Vinson's intestines could be a "life-threatening emergency" (McCullough Dep.100, ECF No. 130-5 at 16) or "medical emergency." (Walls Dep. 35, ECF No. 122-4 at 11). A "Min Narrative" indicates that at approximately 9:01 p.m. Vinson had inflicted two large lacerations on each of his arms, and had "cut open his abdomen pulling out a small part of his intest[ine]." (ECF No. 130-23.) The report further states that Vinson was escorted to medical, where Defendants McCullough and Sherman were able to stop the bleeding, but that Vinson refused all other treatment available at SMU. Additionally, the report states that Defendant McCullough notified Defendant Walls, who gave instructions not to send Vinson to the hospital, but instead to have security place him in the restraint chair. (Id.)

A reasonable jury could find from the facts presented and expert testimony that Defendants Walls, Sherman, and McCullough were aware that a substantial risk of serious harm existed for Vinson and nevertheless delayed his medical treatment. (See, e.g., Grametbaur Dep. 51, 60-63, ECF No. 130-12 at 1, 2 (discussing the duty of the nurses to immediately contact Emergency Medical



Services as soon as the they became aware of the evisceration rather than place Vinson in a restraint chair); Nguyen Report, Pl.'s Resp. Opp'n Summ. J., Ex. 2, ECF No. 130-11 (same and indicating that a puncture wound to the abdomen, unless there is clear evidence that the penetration is superficial, should be treated as a surgical emergency)); see, e.g., Estelle, 429 U.S. at 104-05 (indicating that an unreasonable delay or withholding treatment can constitute deliberate indifference). Moreover, fully crediting Vinson's version of events, the delay in receiving emergency medical treatment encompassed up to seven hours after nurses knew of the evisceration. The defendants' arguments challenging the disputed facts, credibility, and the expert's opinions—including arguments challenging the veracity of Vinson's testimony; discrepancies in the expert's testimony and reports, to the extent that they exist; and safety justifications—go to the weight of the evidence and should be presented to a jury. Thus, the court finds that genuine issues of material fact preclude summary judgment against these defendants.

Nor are these defendants entitled to qualified immunity on this record. Qualified immunity shields governmental officials performing discretionary functions from liability for damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. Id. at 235, 242.

In determining whether the right violated was clearly established, the court defines the right " 'in light of the specific context of the case, not as a broad general proposition.' " Parrish v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). Further,

> [a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). In analyzing this prong, a court in this district generally must look only to case law from the United States Supreme Court, the Court of Appeals for the Fourth Circuit, and the South Carolina Supreme Court. Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999).

With regard to the first prong, as stated above, on this record, a reasonable jury, if it credited the testimony of the plaintiff and his witnesses, could find that Defendants Walls, McCullough, and Sherman's conduct violated Vinson's Eighth Amendment rights. With regard to the second prong, no reasonable medical official, based on Farmer and Estelle, could have believed that knowingly failing to provide an inmate with an eviscerated bowel with immediate and appropriate medical attention was lawful under the circumstances alleged by Vinson. See Pearson, 555 U.S. at 231-32. Accordingly, these defendants are not entitled to summary judgment.

E.     **Defendant Poiletman**

Defendant Poiletman is a psychiatrist employed by SCDC to provide psychiatric services to inmates. Vinson essentially alleges that this defendant violated his Eighth Amendment rights by



failing to treat a serious medical need of Vinson's. Specifically, Vinson alleges and his expert appears to indicate that Defendant Poiletman should have ensured that Vinson "had an appropriate examination and assessment; an appropriate diagnosis and plan of treatment; was properly monitored; and was treated leading to and after the February 28, 2008, episode of self injurious behavior that placed the Plaintiff on Crisis Intervention Status." (Pl.'s Resp. Opp'n Summ. J. at 34, ECF No. 130 at 34; see also Excerpts from Merikangas Dep., ECF No. 130-16.) Vinson further argues that notwithstanding Vinson's requests to speak with him, Defendant Poiletman consciously refused to provide psychiatric services to Vinson while he was on Crisis Intervention Status from February 28, 2008 through March 8, 2008 and consciously neglected to provide services to Vinson after March 8, 2008.

Defendant Poiletman testified that he is not part of a mental health team and only provides services to inmates when a visit is scheduled or requested by a counselor, and indicated that he was not notified of Vinson's placement on Crisis Intervention. (Poiletman Dep. at 11-18, 63, ECF No. 122-7 at 4-6, 17.) Further, the only encounter Defendant Poiletman had with Vinson within thirty days prior to the March 7, 2008 incident was an examination on February 19, 2008 where Vinson did not exhibit signs, symptoms, or intentions to self-mutilate. (Med. Encounter 1281, ECF No. 122-2 at 9-10.) Vinson argues that there is a genuine issue of material fact over whether Dr. Poiletman had actual notice; however, he has failed to point to any evidence or support for this assertion. Viewing the facts in the light most favorable to Vinson and even considering the testimony of the plaintiff's expert, no reasonable jury could find that Defendant Poiletman had actual knowledge of a substantial risk of harm to Vinson and disregarded that substantial risk. Farmer, 511 U.S. at 847. Moreover, Vinson's assertion that Defendant Poiletman's actions violated an SCDC policy are

insufficient, as violations of prison policies alone do not rise to the level of a constitutional deprivation. See Keeler v. Pea, 782 F. Supp. 42, 44 (D.S.C. 1992) (stating that violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983).

**F.     Defendant Sutton**

Prior to placing Vinson in the restraint chair, Lieutenant Robinson contacted Defendant Sutton to obtain approval. Plaintiff argues that Defendant Sutton's approval of the restraint chair violated his Eighth Amendment rights. Although Defendant Sutton and Lieutenant Robinson could not recall the exact conversation, all of the testimony presented indicates or is consistent with the defendant's position that Dr. Walls first ordered Vinson to be placed in the restraint chair and then Defendant Sutton authorized placement. (See Defs.' Cartlege & Sutton Reply Br. at 6-10, ECF No. 132 at 6-10) (listing and discussing testimony). Further, Defendant Sutton and Robinson testified that Defendant Sutton authorized the use of the restraint chair "per medical." Vinson's attempt to create a genuine issue of material fact by arguing that the Use of Restraint Chair and Observation Log indicates that Defendant Sutton authorized use of the restraint chair at 11:20 p.m. and *Nurse McCullough* signed the form approving application of the restraint chair at 11:30 p.m. (Pl.'s Resp. Opp'n Summ. J., Ex. 20, ECF No. 130-20), and a medical record noted that Dr. Walls called at 11:25 p.m. and directed use of the restraint chair (Med. Records, Encounter 1299, ECF No. 122-2 at 4-5), is insufficient in the face of the abundant, uncontroverted evidence that Dr. Walls authorized use of the chair before Sutton, including Vinson's own pleadings and expert testimony. Moreover, Defendant Sutton's testimony indicates that she relies on the judgment of medical personnel for medical use of the restraint chair, as that is their area of expertise while hers is security. Because most prison officials are not trained medical personnel, they are entitled to rely on the opinions,



judgment, and expertise of medical personnel concerning the course of treatment which the medical personnel deemed necessary and appropriate for the prisoner.[3]  See Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990).

A claim based upon the doctrine of *respondeat superior* does not give rise to a § 1983 claim. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-94 (1978). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 (2009).  As the Iqbal Court observed, because masters do not answer for the torts of their servants in § 1983 cases, "the term 'supervisory liability' is a misnomer." Id. at 1949.  Indeed, the dissent in Iqbal opined that "[l]est there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating [ ] supervisory liability entirely." Id. at 1957 (Souter, J., dissenting).  Moreover, even if the majority in Iqbal did not entirely dispense with the concept of liability of a supervisor in a § 1983 case, contrary to Vinson's assertion, he cannot demonstrate liability on the record before the court based on Fourth Circuit precedent.  See Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999); Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (outlining the requirements to hold a supervisor liable for constitutional injuries inflicted by their subordinates, including "evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury").

---

[3] To the extent that Vinson relies on an SCDC policy to support his allegation that Sutton violated his constitutional rights, as stated above, violations of prison policies alone do not rise to the level of a constitutional deprivation.  See Keeler, 782 F. Supp. at 44.



**RECOMMENDATION**

Taking the facts in the light most favorable to Vinson, he cannot establish a violation of the Eighth Amendment as a matter of law with regard to defendants Poiletman or Sutton and, therefore, summary judgment should be granted for these defendants. However, genuine issues of material fact exist regarding Vinson's Eighth Amendment claims against Defendants Walls, McCullough, and Sherman, and therefore, summary judgment is not appropriate as to these defendants. Accordingly, the court recommends that the SCDC Defendants' motion for summary judgment be granted and that the Medical Defendants' motion for summary judgment be granted in part and denied in part.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

January 18, 2013
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).